PINTO TECHNOLOGY VENTURES, L.P.; Pinto TV Annex Fund, L.P.; PTV Sciences II, L.P.; Rivervest Venture Fund I, L.P.; Rivervest Venture Fund II, L.P.; Rivervest Venture II (Ohio), L.P.; Bay City Capital Fund IV, L.P.; Bay City Capital Fund IV Co-Investment Fund, L.P.; Chris Owens; Bill Burke; Reese Terry; and Craig Walker, Petitioners,

v.

Jeffery SHELDON and Andras Konya, M.D., Ph.D., Respondents

No. 16-0007

Supreme Court of Texas.

Argued February 28, 2017

OPINION DELIVERED: May 19, 2017

Rehearing Overruled September 22, 2017

B. Russell Horton, R. James George Jr.,
George Brothers Kincaid & Horton LLP,
Austin, Daniel David, Amy Pharr Hefley,
David D. Sterling, J. Mark Little, Baker

Botts, LLP, Houston, Thomas R. Phillips, Baker Botts L.L.P., Austin, for Petitioners.

Jeff Joyce, Huma Ali, Joyce + McFarland LLP, Houston, Craig T. Enoch, Melissa A. Lorber, Enoch Kever PLLC, Austin, for Respondents.

Justice Guzman delivered the opinion of the Court.

Subject to public-policy constraints, forum-selection clauses are generally enforceable in Texas.[1] Though enforceability is not the concern it once was,[2] courts are frequently confronted with disagreements about the specific claims encompassed and the extent to which nonsignatories may resist or enforce such clauses. In determining these matters, common principles of contract and agency law[3] and the parties' chosen language are the fulcrum of our inquiry because forum-selection clauses are creatures of contract and we must give effect to the parties' intent as expressed in the four corners of the document.[4]

Here, certain minority shareholders filed suit alleging dilution of equity interests and the defendants responded, in part, by invoking a forum-selection clause designating Delaware as the proper forum for "any dispute arising out of" a shareholders agreement. The parties ask us to decide (1) which parties are bound to the forum-selection clause as signatories or nonsignatories to the shareholders agreement and (2) whether statutory and common-law tort claims that are factually predicated on the existence or terms of that agreement must be litigated in the contractually designated forum. The trial court granted the defendants' motion to dismiss, but a divided court of appeals reversed, holding the forum-selection clause does not control because the shareholders' extracontractual claims do not allege noncompliance or interference with any rights or obligations derived from the shareholders agreement.[5]

1. See *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 231-32 (Tex. 2008) (orig. proceeding) (enforcement of a forum-selection clause is required unless the clause is "invalid for reasons of fraud or overreaching" or enforcement would contravene "a strong public policy of the forum where the suit was brought," is "unreasonable or unjust," or would result in serious inconvenience (citing *In re AIU Ins. Co.*, 148 S.W.3d 109, 112 (Tex. 2004) (orig. proceeding))); see also *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding) (holding that "a forum-selection clause may be waived, and it would ordinarily be 'unreasonable or unjust' for a court to enforce a forum-selection clause" that has been waived).

2. See *In re AIU Ins. Co.*, 148 S.W.3d at 111 (observing that, "[a]t one time, forum-selection clauses were disfavored by American courts because such clauses were viewed as 'ousting' a court of jurisdiction").

3. See *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding) (identifying six theories that may bind nonsignatories to an arbitration agreement—incorporation by reference, assumption, agency, alter ego, equitable estoppel, and third-party beneficiaries).

4. Cf. *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 520 n.15 (Tex. 2015) (orig. proceeding) ("In deciding ... questions of arbitrability, courts apply the common principles of general contract law to determine the parties' intent."); *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (whether an arbitration agreement can be enforced by or against a nonsignatory depends on the parties' intent as expressed in the agreement).

5. 477 S.W.3d 411, 417-20 (Tex. App.—Houston [14th Dist.] 2015) (noting the shareholders did not assert any claims for breach of the shareholders agreement and that all asserted claims are noncontractual and are premised on general obligations imposed by law rather than the parties' agreement).

■ While "the party who brings a suit is master to decide what law he will rely on,"[6] whether a forum-selection clause applies depends on the factual allegations undergirding the party's claims rather than the legal causes of action asserted.[7] Focusing on the factual allegations in this case rather than the legal theories the minority shareholders elected to pursue, we hold that the shareholders' statutory and common-law tort claims evidence a "dispute arising out of" the shareholders agreement because (1) the existence or terms of the agreement are operative facts in the litigation and (2) "but for" that agreement the shareholders would not be aggrieved.[8] Our holding today is faithful to the parties' chosen contractual language, avoids "slavish adherence to a contract/tort distinction,"[9] and prevents litigants from avoiding a forum-selection clause with "artful pleading."[10] We further hold the shareholders are bound by the forum-selection clause as signatories to the shareholders agreement, except with respect to their claims against the nonsignatory defendants. We therefore reverse the court of appeals' judgment, render judgment dismissing the minority shareholders' claims in part, and remand the case to the trial court for further proceedings in part.

## I. Factual and Procedural Background

Jeffery Sheldon and Andras Konya are shareholders in IDev Technologies, Inc. (IDEV), a developer and manufacturer of medical devices. Sheldon founded IDEV in 1999 and served as its Chief Executive Officer (CEO) until 2008. Konya, an IDEV consultant from 2002 to 2012, is the co-inventor of vascular-stent technology IDEV licensed in 2000. Both Sheldon and Konya initially acquired IDEV common stock through their business relationship with the company. Sheldon later added to his IDEV holdings by purchasing preferred stock.

IDEV engaged in multiple rounds of financing, causing Sheldon's and Konya's proportional ownership interests to change over time. In early 2010, shortly before the events giving rise to the present dispute, Sheldon and Konya allege they owned 5% and 2.4% of IDEV's total outstanding shares, respectively. Following a series of transactions in 2010, however, Sheldon and Konya allege their interests were substantially and wrongfully diluted to a fraction of 1% in a concerted effort by certain controlling parties to wipe out common stockholders after first converting preferred stock to common stock. Sheldon and Konya contend the 2010 transactions manipulated, diluted, and devalued their holdings, depriving them of a significant payout in connection with IDEV's impending acquisition by another company at a considerable sum.

Sheldon and Konya (collectively, the Shareholders) sued IDEV's venture-capital

6. *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913) (law asserted as basis for recovery determines, for jurisdictional purposes, whether the claims arise under federal law).

7. *Cf. In re Rubiola*, 334 S.W.3d at 225.

8. *See Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993) (applying a "same operative facts" test to noncontractual claims); *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 886 (Tex. 2010) (orig. proceeding) ("but for" the agreement containing the forum-selection clause, the plaintiff would have no basis for the complaints made in the lawsuit).

9. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding) (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444 (5th Cir. 2008)).

10. *Id.* (quoting *Ginter*, 536 F.3d at 444).

majority shareholders,[11] IDEV's CEO Chris Owens and Chief ·Financial Officer (CFO) Bill Burke, and IDEV directors Reese Terry and Craig Walker (collectively, the IDEV parties), alleging fraud, breach of fiduciary duty, minority-shareholder oppression, Texas Blue Sky Law violations, and conspiracy as to various parties. The IDEV parties moved to dismiss the claims based on a forum-selection clause in IDEV's 2010 Amended and Restated Shareholders Agreement (2010 Amended Shareholders Agreement), which plays a featured role in the allegations underlying the Shareholders' statutory and common-law tort claims. Sheldon and Konya contest the forum-selection clause's applicability to the dispute for a variety of reasons relating to the circumstances giving rise to the underlying dispute and amendment of the clause to change venue from Texas·to Delaware.

A forum-selection clause· has long been part of IDEV's shareholder agreements, as amended in 2002, 2004, 2006, 2008, and 2010. Both the 2002 and 2004 agreements included a forum-selection clause designating Harris County, Texas, as the forum for "any dispute arising out of" those agreements, but following an amendment in 2006, the shareholders agreement was revised to require litigation of disputes in Delaware:

> [T]he Delaware state courts of Wilmington, Delaware (or, if there is exclusive federal jurisdiction, the United States District Court for the District of Delaware) shall have exclusive jurisdiction and venue over any dispute arising out of this Agreement, and the parties hereby consent to the jurisdiction of such courts.

11. Pinto Technology Ventures, L.P.; Pinto TV Annex Fund, L.P.; PTV Sciences II, L.P.; RiverVest Venture Fund I, L.P.; RiverVest Venture Fund II, L.P.; RiverVest Venture Fund II (Ohio), L.P.; Bay City Capital Fund IV, L.P.;

The 2008 and 2010 agreements carried forward the Delaware forum-selection clause without alteration.

Sheldon signed all of the shareholder agreements, except the 2010 Amended Shareholders Agreement. Konya signed only the 2002 and 2004 shareholder agreements, but, notably, the 2004 agreement authorized written amendments with the assent of IDEV and a majority of the stockholders. Subsequent versions of the shareholders agreement also had provisions allowing for amendment on similar terms.

The stated purpose of each amended shareholders agreement ·was to "promote the best interests" of IDEV and the "mutual interests" of the company and its shareholders by "imposing certain requirements with respect to the voting and transferability of the shares·of [the company's stock] owned by the. Shareholders." To that end, under the shareholders agreement, as amended from time to time,· the shareholders and IDEV have certain rights and obligations that govern the relationship between them.

Several of the amendments to the shareholders agreement coincided with financing required for IDEV's growth and solvency. Series A Financing in 2004 raised approximately $1.8 million; Series B in 2006 raised $24 million; and Series C in 2008 raised an additional $25 million. These transactions diluted the Shareholders' interests over time without any apparent dispute. However, dilution related to Series B-1 financing in 2010 and interconnected actions to amend the shareholders agreement precipitated Sheldon's and

and Bay City Capital Fund IV Co-Investment Fund, L.P. By 2010, the venture-capital funds collectively controlled over 60% of the IDEV issued and outstanding stock.

Konya's claims in the instant lawsuit. In addition to complaining about sundry actions permitted under the 2010 Amended Shareholders Agreement, the Shareholders allege:

- In 2010, the "Defendants set out to reduce [the Shareholders'] holdings ... to a modest fraction of 1% and to similarly dilute other existing shareholders" employing "the following steps to accomplish their goal," among others:

 1. "The venture capital defendants ... caused the board of directors to join with them to amend the Shareholder's Agreement, eliminating Sheldon['s] ... preemptive rights"; and

 2. "[The independent directors] Terry and Walker ... went along with the various steps—including the amendment of the Shareholder Agreement—in breach of their fiduciary duties."

- "The Defendants caused the Shareholder Agreement to be amended in hopes of avoiding Sheldon's (and others') preemptive rights in respect of his common and preferred stock holdings."

- "[T]he 2010 Shareholder Agreement amendment was procured by fraud and breaches of fiduciary duty."

- "Defendants failed to disclose material facts to Sheldon related to the 2010 Shareholder Agreement amendment and related transactions."

- "Defendants may claim no rights under the 2010 Shareholder Agreement amendment as it is unenforceable under [the Blue Sky Law]."

After considering the pleadings on file and the parties' arguments, the trial court granted the motion to dismiss in favor of a Delaware forum and dismissed the lawsuit with prejudice to refiling in Texas.

In a split decision, the court of appeals reversed, holding the forum-selection clause inapplicable to this dispute because an "arising out of" forum-selection clause applies only when the claims would not exist "but for" the agreement containing the clause.[12] The court determined that the rights and obligations underlying the Shareholders' claims derive from statute and common law and, thus, do not "aris[e] out of" the 2010 Amended Shareholders Agreement.[13] Given its holding on the latter question, the court did not consider the Shareholders' additional arguments that, as nonsignatories, CEO Owens and CFO Burke lack enforcement capacity and that Konya is required to litigate only in Harris County, not Delaware.

The dissenting justice assailed the majority's analysis as improperly "consider[ing] just the labels of the claims" instead of "focus[ing] on the substance of the claims."[14] And, more pointedly, the dissent took issue with the majority's application of an unduly conscribed causal-nexus standard that belies a "common-sense examination" of the claims' substance; permits artful pleading; and constrains "arising out of" language to only those disputes brought as breach-of-contract and tortious-interference claims.[15] Rejecting the majority's conclusion, the dissent found the fo-

---

**12.** 477 S.W.3d 411, 418, 421 (Tex. App.— Houston [14th Dist.] 2015) (citing *In re Lisa Laser*, 310 S.W.3d at 886).

**13.** *Id.* at 418, 421 (finding lack of a "but for" relationship between the obligations and rights sued on and the relationship created by the shareholders agreement).

**14.** *Id.* at 421 (CHRISTOPHER, J., dissenting) (citing *In re Fisher*, 433 S.W.3d 523, 529 (Tex. 2014) (orig. proceeding)).

**15.** *Id.*

rum-selection clause controlling because (1) the Shareholders' claims substantively pertain to dilution of Sheldon's and Konya's equity interests; (2) the shareholders agreement was amended "to enable that dilution and to protect the investors who acquired the newly issued stock"; and (3) the factual allegations relating to the dilution are "inextricably enmeshed" and "factually intertwined" with the agreement, surpassing the low "but for" connective threshold.[16]

After an evenly divided en banc panel denied reconsideration, the IDEV parties appealed to this Court, arguing (1) the court of appeals applied an overly restrictive scope-of-coverage standard that necessarily excludes all statutory and common-law tort claims, which are always derived from extra-contractual rights and obligations; (2) a "common-sense examination" of the Shareholders' substantive allegations reveals this "dispute aris[es] out of" the 2010 Amended Shareholders Agreement; (3) Konya is contractually bound to subsequent contract amendments designating Delaware as the exclusive dispute-resolution forum; and (4) CEO Owens and CFO Burke can enforce the forum-selection clause as nonsignatories under the

transaction-participant theory,[17] the substantially interdependent and concerted misconduct doctrine,[18] and the mandatory-venue provisions in Texas Civil Practice and Remedies Code sections 15.004 and 15.020.[19]

In addition to echoing the court of appeals' analysis regarding the scope of the Delaware forum-selection clause, the Shareholders refute both its application as to Konya, because he only signed shareholder agreements designating a Texas forum, and its enforcement by Owens and Burke as nonsignatories under any of the asserted theories.

## II. Discussion

### A. Standard of Review

 Forum-selection clauses provide parties with an opportunity to contractually preselect the jurisdiction for dispute resolution.[20] In Texas, forum-selection clauses are generally enforceable[21] and "should be given full effect."[22] Failing to give effect to contractual forum-selection clauses and forcing a party to litigate in a forum other than the contractually chosen one amounts to " 'clear harassment' ...

**16.** *Id.* at 421-24.

**17.** *See, e.g., Carlile Bancshares, Inc. v. Armstrong*, Nos. 02-14-00014-CV, 02-14-00018-CV, 2014 WL 3891658, at *10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) ("Nonsignatories may be subject to forum-selection clauses if they were transaction participants.").

**18.** *Deep Water Slender Wells, Ltd. v. Shell Int'l Expl. & Prod., Inc.*, 234 S.W.3d 679, 694 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("Courts should apply equitable estoppel when a signatory to the contract containing the forum-selection clause raises allegations of substantially interdependent and concerted misconduct by both nonsignatories and one or more signatories to the contract.").

**19.** *See* Tex. Civ. Prac. & Rem. Code §§ 15.004 (if one claim is governed by a mandatory-venue provision, all joined claims shall be brought in the county required by that provision), .020 (a party may not bring an action arising from a major transaction in a county if the party "agreed in writing that an action arising from the transaction must be brought in another county of this state or in another jurisdiction").

**20.** *See, e.g., In re AIU Ins. Co.*, 148 S.W.3d 109, 111 (Tex. 2004) (orig. proceeding).

**21.** *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding).

**22.** *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 883 (Tex. 2010) (orig. proceeding).

injecting inefficiency by enabling forum-shopping, wasting judicial resources, delaying adjudication on the merits, and skewing settlement dynamics. . . ."[23]

■ Here, the parties agree the forum-selection clause is generally enforceable, but disagree about who may enforce it, who is bound by it, and whether the statutory and common-law tort claims alleged in this lawsuit constitute a "dispute arising out of" the 2010 Amended Shareholders Agreement. In considering these matters, we may seek guidance from federal law analyzing forum-selection clauses and draw analogies between forum-selection clauses and arbitration clauses,[24] which are "a specialized kind of forum-selection clause."[25]

We begin our analysis by considering the scope of the forum-selection clause.

## B. The Claims Fall within the Scope of the Forum-Selection Clause

■ Whether Sheldon and Konya's non-contractual claims fall within the forum-selection clause's scope depends on the parties' intent as expressed in their agreement and a "common-sense examination" of the substantive factual allegations.[26] Legal theories and causes of action are not controlling.[27] Rather, we avoid "slavish adherence to a contract/tort distinction,"[28] because doing otherwise "would allow a litigant to avoid a forum-selection clause with 'artful pleading.'"[29]

The starting point of the inquiry is the forum-selection clause's language.[30] In this case, the parties agreed to resolve "any dispute arising out of this Agreement" in Delaware. Dictionaries define "arise" to mean "to originate from a specified source,"[31] "to stem (from),"[32] and "[t]o result (from)."[33] This Court has observed that the words "arising out of" have "broad[ ] significance,"[34] and we discern no significant limitation on their breadth from the language employed in the shareholders agreement.

In the insurance context, we have described similar language as connoting "a

---

23. *Id.* (quoting *In re AutoNation, Inc.*, 228 S.W.3d 663, 667-68 (Tex. 2007) (orig. proceeding)).

24. *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding).

25. *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

26. *In re Int'l Profit Assocs.*, 274 S.W.3d at 677.

27. *Cf. In re Rubiola*, 334 S.W.3d 220, 225 (Tex. 2011) (orig. proceeding) (courts are required to " 'focus on the factual allegations of the complaint, rather than the legal causes of action asserted' " (quoting *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 900 (Tex. 1995))).

28. *In re Int'l Profit Assocs.*, 274 S.W.3d at 677 (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444 (5th Cir. 2008)).

29. *Id.* (quoting *Ginter*, 536 F.3d at 444).

30. *See Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed.Appx. 612, 616 (5th Cir. 2007) ("[W]e look to the language of the parties' contracts to determine which causes of action are governed by the forum selection clause." (quoting *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998) (internal quotations omitted))).

31. *Arise*, Webster's Third New Int'l Dictionary (2002).

32. *Arise*, Black's Law Dictionary (10th ed. 2014).

33. *Id.*

34. *In re NEXT Fin. Grp.*, 271 S.W.3d 263, 268 (Tex. 2008) (orig. proceeding) (an arbitration case quoting *Utica National Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004), an insurance case).

causal connection or relation," [35] conclud-ing but-for causation is sufficient, even without direct or proximate causation.[36] A "but for" cause is one "without which the event could not have occurred." [37] In de-scribing the temporal reach of but-for cau-sation, we have repeatedly observed it "has in itself no limiting principle; it liter-ally embraces every event that hindsight can logically identify in the causative chain." [38]

Bearing these standards in mind, we previously applied the but-for causal stan-dard to a forum-selection clause applicable to "any dispute arising out of" a distribu-tion agreement in *In re Lisa Laser USA, Inc.*, and concluded that a party's "claims arise out of the Agreement" when "but for the Agreement, [the party] would have no basis to complain." [39]

Examining federal law for further guid-ance, we note that federal courts take a wide variety of approaches in interpreting "arising out of" or "arising under" forum-selection clauses, especially when deter-mining whether such a clause extends to noncontractual claims.

The Seventh Circuit, for example, has been openly critical of the but-for test:

But-for causation is an unsatisfactory understanding of language referring to "disputes arising out of" an agreement. Let us suppose that while inspecting Omron's facilities, a manager of Maclar-en stepped on a baby rattle and fell. Would the ensuing tort litigation go to the High Court of Justice in the United Kingdom just because, but for the distri-bution agreement, none of Maclaren's employees would have been on Omron's premises? "Arising out of" and "arising under" are familiar phrases, and courts have resisted the siren call of collapsing them to but-for causation. An example: but for the existence of federal drug safety standards, it would not be possi-ble to contend that noncompliance with the standards is tortious, but it does not follow that a tort suit "arises under" those standards and thus activates fed-eral jurisdiction.[40]

Faced with a forum-selection clause simi-lar to the one in *Lisa Laser*, the Seventh Circuit ultimately concluded that "all dis-putes the resolution of which arguably de-pend on the construction of an agreement 'arise out of' that agreement." [41]

The First Circuit has applied a "same operative facts" test, holding that "con-tract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting par-ties." [42] Federal courts in different jurisdic-tions, including Texas federal courts, have also found satisfaction of this test suffi-cient to invoke a contractual forum-selec-

---

**35.** *Utica*, 141 S.W.3d at 203.

**36.** *Id.*

**37.** *But-For Cause*, BLACK's LAW DICTIONARY (10th ed. 2014); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007) (de-fining "but for" cause as "one without which the event would not have occurred").

**38.** *Plains Expl. & Prod. Co. v. Torch Energy Advisors. Inc.*, 473 S.W.3d 296, 308 (Tex. 2015) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 581 (Tex. 2007)).

**39.** 310 S.W.3d 880, 886 (Tex. 2010) (orig. proceeding).

**40.** *Omron Healthcare, Inc. v. Maclaren Exps. Ltd.*, 28 F.3d 600, 602 (7th Cir. 1994).

**41.** *Id.* at 603.

**42.** *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993).

tion clause.[43]

Noting the absence of a specifically articulated test under Fifth Circuit jurisprudence, one federal district court recently opined that courts within that circuit generally consider (1) "whether the tort claims 'ultimately depend on the existence of a contractual relationship between the parties,'" (2) "whether 'resolution of the claims relates to interpretation of the contract,'" and (3) "whether the claims 'involv[e] the same operative facts as a parallel claim for breach of contract.'"[44]

The court of appeals in this case took a much narrower approach, concluding a dispute arises out of a contract only when claims are based on the rights and duties established in the contract, regardless of whether the operative facts of the dispute involve the validity, terms, or performance of the agreement or have a substantial connection to it. When applied to the forum-selection clause in this case, however, an analytical construct that focuses only on the causes of action alleged and a hypothetical world where the agreement does not exist is inapt for several reasons.

■ First, the contractual language at issue here uses the word "dispute"—defined as "[a] conflict or controversy, esp. one that has given rise to a particular lawsuit."[45] "Claim," on the other hand, means "the assertion of an existing right" or "[a] demand for money, property, or a legal remedy to which one asserts a right."[46] When a forum-selection clause encompasses all "disputes" "arising out of" the agreement, instead of "claims," its scope is necessarily broader than claims based solely on rights originating exclusively from the contract.[47]

---

43. *Morgan–Rinehart v. Van de Perre*, A-16-CA-01327-SS, 2017 WL 1383933, at *8 (W.D. Tex. Apr. 12, 2017) (noting that "[a]lthough the Fifth Circuit has not articulated a specific test for determining when claims fall within the scope of a forum selection clause, district courts within this circuit usually look to three rules [including] whether the claims 'involv[e] the same operative facts as a parallel claim for breach of contract'" (quoting *Alliant-Group, L.P. v. Mols*, CV H-16-3114, 2017 WL 432810, at *7 (S.D. Tex. Jan. 30, 2017))); *see also Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 695 (8th Cir. 1997) ("The First Circuit's approach is more revealing in this case.... Although we recognize that Terra's claims are alleged as tort claims, Terra plainly could have asserted a parallel claim for breach of contract in the same complaint."); *Forrest v. Verizon Comm'cs, Inc.*, 805 A.2d 1007, 1014 (D.C. 2002) ("We follow the number of courts that have held that non-contract claims that involve the same operative facts as a parallel breach of contract claim fall within the scope of a forum selection clause.").

44. *Morgan–Rinehart*, 2017 WL 1383933, at *8 (examining a forum-selection clause applying to "any legal action arising out of" a settlement agreement).

45. *Dispute*, BLACK'S LAW DICTIONARY (10th ed. 2014).

46. *Claim*, BLACK'S LAW DICTIONARY (10th ed. 2014).

47. *See Abbott Labs. v. Takeda Pharm. Co. Ltd.*, 476 F.3d 421, 424 (7th Cir. 2007) ("Abbott repeats its argument in different words when it says that since its suit is a tort suit—a suit for breach of a fiduciary duty to a partner in a joint venture—it arises out of Delaware tort law rather than out of the 1985 agreement. But the forum selection clause does not apply just to the litigation of *claims* that arise out of, concern, etc., the contract; it applies to the litigation of *disputes* that arise out of, concern, etc., the contract."); *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F.Supp. 1334, 1378 (N.D. Iowa 1996) ("Terra's assertion of tort claims would not necessarily evade a forum selection clause even if that clause, by its terms, applied only to contract causes of action, [but] the fact that the clause applies to 'any disputes' [] plainly expands the scope of the clause to include the tort claims at issue here.").

■ Second, the analysis the court of appeals applied encourages "artful pleading." A plaintiff could characterize its claim as a statutory or common-law tort claim to evade the agreed-upon forum despite essential allegations that are "inextricably enmeshed" or "factually intertwined" with the underlying contract.[48] In such cases, the forum-selection clause should be denied force only "if the facts alleged in support of the claim stand alone, are completely independent of the contract, and the claim could be maintained without reference to the contract."[49] "We cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through artful pleading of tort claims in the context of a contract dispute."[50]

■ With this legal framework in mind, we turn to the factual allegations supporting the Shareholders' complaints to determine whether (1) the existence or terms of the 2010 Amended Shareholders Agreement are operative facts in the dispute and (2) "but for" that agreement the shareholders would not be aggrieved. Engaging in a common-sense examination of the substance of the claims made and the terms of the forum-selection clause,[51] we conclude the claims fall within the clause's scope. Reviewing the allegations in the live pleadings, the dispute substantively concerns (1) the elimination of preemptive rights and designated shareholder statuses, (2) the dilution of equity, (3) various misrepresentation or omissions of required disclosures, and (4) actions taken without notice as required by the shareholders agreement.[52]

In examining these disputes, a but-for relationship between the disputes and the shareholders agreement is evident. First, the 2008 shareholders agreement granted Sheldon preemptive rights and designated Sheldon as a "Significant Shareholder" and both Sheldon and Konya as "Key Shareholders"; the 2010 Amended Shareholders Agreement eliminated those rights and designations; but for these agreements, no dispute about the loss of preemptive rights and designations would exist. Second, uncontroverted evidence reveals that IDEV could not have obtained essential financing without amending the shareholders agreement in 2010; without amending the shareholders agreement in 2010, dilution of equity would not have occurred as alleged; thus, the dispute over diluted equity would not exist but for the 2010 amendment. Third, the petition explicitly states that the IDEV parties "failed to disclose material

---

**48.** *See AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 194-95 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (involving an arbitration provision extending to "[a]ny claim or controversy arising out of or relating to" a purchase agreement).

**49.** *Id.* at 195.

**50.** *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) (punctuation removed).

**51.** *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (orig. proceeding); *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding).

**52.** Sheldon and Konya complain of adverse actions the venture-capital defendants effected "without prior notice to other shareholders," including the conversion of preferred stock to common stock, the implementation of a reverse stock split, and the amendment of the shareholders agreement. The obligations to provide notice to other shareholders are found in various provisions of the shareholder agreements. For example, those with preemptive rights—like Sheldon before the 2010 amendments altered his rights under the 2008 shareholders agreement—are entitled to notice of any sale or offering of new securities. Additionally, any party to the shareholders agreement that did not consent to an amendment of agreement is entitled to "prompt notice" of the amendment.

facts to Sheldon related to the 2010 [Amended] Shareholder[s] Agreement"; since the facts allegedly withheld were related to the 2010 amendment, no dispute would exist but for the agreement.

Additionally, we note that many of the statutory and common-law tort claims involve the same operative facts that would be implicated in a parallel breach-of-contract claim, had one been pursued. The shareholders agreement was designed to (1) protect the signatories from dilution, (2) grant them preemptive rights and shareholder-status designations, and (3) provide information rights and notice requirements. A contract claim or defense implicating these issues would involve the same operative facts as statutory and common-law tort claims addressing the same matters. Sheldon acknowledges this fact, stating "Sheldon chose, as was his right, not to seek a contractual remedy for violation of the preemptive right and of anti-dilution provisions of the shareholder agreements." Although Sheldon has that right, he cannot "evade enforcement of forum selection agreements through artful pleading of tort claims in the context of a contract dispute." [53]

Sheldon and Konya's petition reveals the central role the shareholders agreement plays in their claims. Notably, the factual allegations giving rise to the noncontractual claims are integral to the dispute's resolution.[54] Even though shareholders and corporations can have relationships without an agreement like the one at issue here, we cannot ignore the reality that an agreement, in fact, governs their relationship and Sheldon's and Konya's alleged grievances emanate from the existence and operation of that agreement. So, while shareholders might be able to assert tortious-interference, breach-of-fiduciary-duty, and other noncontractual claims even without a shareholders agreement,[55] the allegations in this case invoke the 2010 Amended Shareholders Agreement as an integral part of Sheldon's and Konya's claimed injuries. The claims asserted ultimately, and actually, depend on the existence of the 2010 Amended Shareholders Agreement, resolution of the case involves the validity of that agreement, and the operative facts implicate the IDEV parties' authority to act pursuant to that agreement.

For these reasons, we hold the dispute at issue arises out of the 2010 Amended Shareholders Agreement and therefore falls within the scope of the Delaware forum-selection clause. Our holding today is consistent with our precedent requiring that we focus on the substance of the claims, not the labels, and avoid "slavish adherence to a contract/tort distinction." [56] "To hold to the contrary would allow a litigant to avoid a forum-selection clause

---

**53.** *Lambert,* 983 F.2d at 1121 (punctuation removed).

**54.** *See Abbey v. Skokos,* 303 Fed.Appx. 911, 913 (2d Cir. 2008) (noting that "dispute[s] aris[e]" under a partnership agreement when the agreement is "integrally related" to the action and when the purchasing or sale of securities at issue in the common-law fraud, securities fraud, and negligent misrepresentation action is "accomplished through the partnership agreement").

**55.** *See* 477 S.W.3d at 418, 420 n.11 (observing that, even if there had been no shareholders agreement, the Shareholders would still be able to assert all their claims and a relationship would still exist between the parties because "[n]one of the parties to the shareholders agreement were obligated to enter into it by applicable corporate law").

**56.** *In re Int'l Profit Assocs.,* 274 S.W.3d at 677 (quoting *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte,* 536 F.3d 439, 444 (5th Cir. 2008)).

with 'artful pleading.' " [57]

We depart this issue with one final note concerning the but-for test and Sheldon and Konya's argument that when a claim arises out of "general obligations imposed by law," it cannot arise out of the contract.[58] This may or may not be true for a forum-selection clause that covers "any *claim* arising from the Agreement," which we need not decide, but it is assuredly not true for a, clause that applies to "any *dispute* arising from the Agreement." We recognize that language in *Lisa Laser* suggests the but-for test was satisfied there because the obligations arose out of the agreement, rather than general obligations imposed by law.[59] But while the fact that the obligations arose directly out of the agreement was sufficient to establish a but-for relationship between the "dispute" and the agreement in that case, we did not conclude it was necessary.

### C. Konya is Bound by the Delaware Forum-Selection Clause

 Even if the shareholders' statutory and common-law tort claims fall within the scope of the forum-selection clause, Konya asserts he is not required to litigate in Delaware because he signed only the 2004 Amended Shareholders Agreement, which designated a Texas forum, and thus never assented to a Delaware forum. We disagree.

Although Konya did not sign a shareholders agreement designating a Delaware forum, he agreed that the 2004 Amended Shareholders Agreement could be amended by "a written instrument signed by the Corporation and the holders of at least a majority of the then outstanding shares of voting stock of the Corporation that are subject to [the shareholders] Agreement," with certain limitations not alleged to be applicable here (Majority Amendment Provision). Konya does not dispute that this protocol was followed when the forum-selection clause was amended in 2006 to vest exclusive jurisdiction in Delaware.[60] Instead, Konya argues that a provision included in the 2004, 2006, 2008, and 2010 shareholder agreements made all amendments effective only "at such time [the amended shareholders agreement] is executed by the corporation and, with respect to a Shareholder, by such Shareholder" (Effectiveness Provision). Because he never signed the 2006 agreement, he argues amendment of the forum-selection clause is ineffective as to him.

 The Effectiveness Provision states: "This Agreement shall become effective at such time it is executed by the Corporation and, with respect to a Share-

---

**57.** *Id.* (quoting *Ginter*, 536 F.3d at 444).

**58.** The court of appeals took a similar position: "A common-sense examination of the substance of the Shareholders' claims shows that general legal obligations, rather than any of the shareholders agreements, establish the alleged duties that the IDev Parties purportedly breach.... Thus, the agreements with a Delaware forum-selection clause and the plaintiffs' claims lack the 'but for' relationship upon which the Supreme Court of Texas relied in *Lisa Laser*." 477 S.W.3d at 418.

**59.** *See, e.g., In re Lisa Laser USA, Inc.,* 310 S.W.3d 880, 884-86 (2010) (orig. proceeding)

("HealthTronics alleges that Lisa Laser failed to inform it of new products and failed to offer it a right of first refusal to distribute new products in the United States. Lisa Laser's *obligation, if any, to do so only arises from the Distribution Agreement* ... HealthTronics's claims *arise out of the Agreement rather than other general obligations imposed by law*. That is, *but for the Agreement*, HealthTronics would have no basis to complain...." (emphases added)).

**60.** Nor does Konya dispute that the amendments to the 2008 and 2010 shareholder agreements complied with the nonunanimous amendment provisions in those agreements.

holder, by such Shareholder." We interpret contracts to "harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."[61] Konya signed the 2004 agreement, thereby consenting to non-unanimous amendment of the agreement. To interpret the Effectiveness Provision as requiring Konya's signature to bind him to the amended agreement would render the Majority Amendment Provision meaningless. The only reasonable interpretation of the Effectiveness Provision is that it applies to shareholders who had not already consented to the Majority Amendment Provision in the 2004 agreement and provides the method by which new shareholders become parties to the shareholders agreement. Shareholders who consented to the Majority Amendment Provision in the 2004 agreement would already be bound by amendments made in accordance with their assent to the amendment provision.

Thus, when Konya signed the 2004 agreement and consented to the Majority Amendment Provision, Konya bound himself to any properly amended forum-selection clause.[62] Further, in his petition, Konya alleges "Konya was identified in the Shareholder Agreement as a 'Key Shareholder,'" indicating he will rely on this status designation in his suit. But Konya was not identified as a "Key Shareholder" until the 2006 agreement. Konya cannot rely on an agreement for a status designation and at the same time argue the agreement's provisions are not effective as to him.

Accordingly, we hold Konya bound himself to the Delaware forum-selection clause by signing the 2004 agreement and consenting to nonunanimous amendment of that agreement.

### D. Owens and Burke Cannot Enforce the Forum-Selection Clause

■ Owens signed the 2010 Amended Shareholders Agreement as IDEV's CEO, but not in his individual capacity. Burke, IDEV's CFO, did not sign the agreement in any capacity. As a general proposition, a forum-selection clause may be enforced only by and against a party to the agreement containing the clause.[63] Because forum-selection clauses are creatures of contract, the circumstances in which non-signatories can be bound to a forum-selection clause are rare.[64] The question here is whether Owens and Burke as nonsignatories can invoke the forum-selection clause against Sheldon and Konya as signatories to the agreement.

Owens and Burke contend enforcement is permitted under the following theories: (1) the transaction-participant theory; (2) the substantially interdependent and concerted misconduct doctrine; and (3) the

---

61. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

62. *See Fort Transfer Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, No. 05-1236, 2006 WL 1582451, at *3 (C.D. Ill. June 6, 2006) (holding party who signed an agreement with a provision providing another party with authority to unilaterally amend the agreement is bound to a unilaterally amended forum-selection clause).

63. *Cf. In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (orig. proceeding) (discussing arbitration agreements).

64. *Id.*; *cf. G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 524 (Tex. 2015) ("We have recognized, however, that in some circumstances a non-signatory can be bound to, or permitted to enforce, an arbitration agreement."); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding) (identifying theories arising out of common principles of contract and agency law that may bind nonsignatories to an arbitration agreement).

mandatory-venue provisions in sections 15.004 and 15.020 of the Texas Civil Practice and Remedies Code. We conclude, however, that none of these theories supports enforcement of the forum-selection clause as to the claims against Owens and Burke and, as a result, the trial court erred in granting their motion to dismiss.

### 1. Transaction Participants

Although this Court has not previously addressed the matter, other courts have held that "transaction participants" may enforce a valid forum-selection clause even if they are not actual signatories to the contract.[65] A "transaction participant" includes "an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum selection clause."[66] Courts recogniz-

ing the validity of this enforcement theory have done so "solely in the context of a nonsignatory defendant attempting to enforce a forum-selection clause against a signatory plaintiff, who did not want the clause enforced," and not the converse.[67]

As articulated by our intermediate appellate courts, the transaction-participant theory is similar to the doctrine federal courts employ to bind nonsignatories to forum-selection clauses when they are "closely related to the contractual relationship."[68] In such circumstances, enforcement is permitted if the relationship between a nonsignatory and a signatory to the contract is close enough that the non-signatory's enforcement of the forum-selection clause would be "foreseeable" to the opposing party.[69] The rationale supporting enforcement in such circumstances is that signatories have already "assented

---

**65.** *See Carlile Bancshares, Inc. v. Armstrong,* Nos. 02-14-00014-CV, 02-14-00018-CV, 2014 WL 3891658, at *10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) ("Nonsignatories may be subject to forum-selection clauses if they were transaction participants." (citing *Brock v. Entre Comput. Ctrs., Inc.,* 740 F.Supp. 428, 430-31 (E.D. Tex. 1990))); *see also Dunlap Enters. v. Roly Poly Franchise Sys., L.L.C.,* No. 05-08-01556-CV, 2010 WL 2880179, at *3 (Tex. App.—Dallas July 23, 2010, no pet.) (finding no abuse of discretion in trial court's finding that nonparties were subject to forum-selection clause as "transactional participants" in those agreements); *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 75 (Tex. App.—Dallas 1996, no pet.) (observing that "a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract"), *overruled in part on other grounds by In re Tyco Elecs. Power Sys., Inc.,* No. 05-04-01808, 2005 WL 237232, at *4 & n.1 (Tex. App.—Dallas Feb. 2, 2005, orig. proceeding) (mem. op.).

**66.** *Accelerated Christian,* 925 S.W.2d at 75.

**67.** *Carlile Bancshares,* 2014 WL 3891658, at *10.

**68.** *See, e.g., Magi XXI, Inc. v. Stato della Citta del Vaticano,* 714 F.3d 714, 723 (2d Cir. 2013) ("We hold that a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory." (punctuation removed)); *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.,* 485 F.3d 450, 456 (9th Cir. 2007) ("[W]here the alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and nonparties, should benefit from and be subject to forum selection clauses."); *Marano Enters. of Kan. v. Z–Teca Rests., L.P.,* 254 F.3d 753, 757-58 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir. 1998); *Baker v. LeBoeuf, Lamb, Leiby & Macrae,* 105 F.3d 1102, 1105-06 (6th Cir. 1997); *Manetti–Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n.5 (9th Cir. 1988).

**69.** *Magi XXI,* 714 F.3d at 723; *see also Lipcon,* 148 F.3d at 1299 ("In order to bind a nonparty to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." (quoting *Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir. 1993))).

to a forum selection clause and thus have agreed to litigate disputes relating to the contract in the chosen forum" such that enforcing the provision "comports with the 'legitimate expectations of the parties, [as] manifested in their freely negotiated agreement.' " [70]

■■■■ We need not decide whether a transaction participant could enforce a forum-selection clause, or under what circumstances, because we conclude the 2010 Amended Shareholders Agreement's express terms preclude its application in this case. As we have said in an analogous context, the question of who is actually bound to dispute resolution in the contractually specified forum " 'is [ultimately] a function of the intent of the parties as expressed in the terms of the agreement.' " [71]

Section 25 of the 2010 Amended Shareholders Agreement sets out the forum-selection clause and, at the same time, limits the rights and remedies of nonparties to the agreement as follows:

> This Agreement ... shall inure to the benefit of and be binding upon, the successors, permitted assigns, legatees, distributees, legal representatives and heirs of each party and *is not intended to confer upon any person, other than the parties and their permitted successors and assigns, any rights or remedies hereunder.* [72]

The contract's plain language thus disclaims any intent to extend the contract's benefits to nonparties. Allowing Owens and Burke to enforce the forum-selection clause as "transaction participants" would contravene the parties' expressed intent and is, thus, impermissible. [73] Moreover, in light of the contract's language, .enforcement of the forum-selection clause by Owens and Burke against Sheldon and Konya would not have been reasonably foreseeable, as the transaction-participant enforcement theory contemplates.

■■■ We acknowledge, however, that contract language can extend enforcement rights to nonsignatories, as we held in *In re Rubiola*, an arbitration case in which we concluded that nonsignatories to an arbitration agreement could compel arbitration of claims brought by contract signatories when "the arbitration agreement expressly provides that certain non-signatories are considered parties" to the agreement. [74] The *Rubiola* agreement defined the contract parties to include "Rubiola Mortgage Company, and each and all persons and entities signing this agreement or any other agreement between or among any of the parties as part of this transaction" as well as "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents." [75] Accordingly, Rubiola Mortgage Company's President and Vice President were, by express agreement, parties to the contract.

**70.** *Magi XXI*, 714 F.3d at 723.

**71.** Cf. *In re Rubiola*, 334 S.W.3d 220, 224-25 (Tex. 2011) (orig. proceeding) (holding "parties to an arbitration agreement may grant nonsignatories the right to compel arbitration" and quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355, 358 (5th Cir. 2003), with regard to nonsignatory enforcement of an arbitration agreement).

**72.** Emphasis added.

**73.** *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014) ("A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule.").

**74.** 334 S.W.3d at 225.

**75.** *Id.* at 222-23.

Here, the parties were neither silent on the matter nor as inclusive as *Rubiola* with respect to their intent. To the contrary, the 2010 Amended Shareholders Agreement extends to a more narrow group of nonparties, speaks directly to the matter at hand, and disavows any intent to extend contractual rights and remedies to anyone other than the parties and their permitted successors and assignees.

We therefore hold that Owens and Burke cannot rely on the transaction-participant doctrine to enforce the forum-selection clause against Sheldon and Konya.

## 2. The Concerted Misconduct Doctrine

 Owens and Burke also seek the benefits of the contractual forum-selection clause based on the "substantially interdependent and concerted misconduct" doctrine. Under this equitable-estoppel doctrine, nonsignatories may enforce a forum-selection clause "when a signatory to the contract containing the forum selection clause raises allegations of substantially interdependent and concerted misconduct by both non-signatories and one or more signatories to the contract." [76]

In *G.T. Leach Builders, LLC v. Sapphire V.P., LP*,[77] we observed that we had

---

**76.** *CKH Family Ltd. P'ship v. MGD/CCP Acquisition, LLC*, No. 05-12-00573-CV, 2013 WL 5614304, at *4 (Tex. App.—Dallas Oct. 14, 2013, no pet.); *see also Deep Water Slender Wells, Ltd. v. Shell Int'l Expl. & Prod., Inc.*, 234 S.W.3d 679, 694 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *Phx. Network Techs. (Eur.)Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 622-24 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *accord CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 894 (Tex. App.—Dallas 2007, pet. denied).

**77.** 458 S.W.3d 502 (Tex. 2015).

**78.** 235 S.W.3d 185, 191-92 (Tex. 2007) (orig. proceeding) (stating "we have never compelled arbitration based solely on substantial-

---

previously declined to adopt the concerted-misconduct doctrine in an arbitration case, *In re Merrill Lynch Trust Co. FSB*,[78] and would not reconsider the matter because the parties neither addressed nor distinguished *Merrill Lynch*.[79] We do the same in this case for the same reason.[80]

## 3. The Major-Transaction Mandatory-Venue Provision

Section 15.020(c) of the Texas Civil Practice and Remedies Code provides:

[A]n action arising from a major transaction may not be brought in a county if:

. . . .

(2) the party bringing the action has agreed in writing that an action arising from the transaction must be brought in another county of this state or in another jurisdiction, and the action may be brought in that other county, under this section or otherwise, or in that other jurisdiction.[81]

The term "major transaction" is defined as "a transaction evidenced by a written agreement under which a person pays or receives, or is obligated to pay or entitled to receive, consideration with an aggregate

---

ly interdependent and concerted misconduct, and for several reasons we decline to do so here").

**79.** *G.T. Leach Builders*, 458 S.W.3d at 529 n.23.

**80.** *Cf. In re Golden Peanut Co.*, 298 S.W.3d 629, 631 (Tex. 2009) (orig. proceeding) ("[A]rbitration clauses are, 'in effect, a specialized kind of forum-selection clause.'" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974))); *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding) ("[W]e have drawn analogies between forum-selection clauses and arbitration clauses.").

**81.** Tex. Civ. Prac. & Rem. Code § 15.020(c).

stated value equal to or greater than $1 million."[82]

Section 15.020 is a mandatory-venue provision, and when it is implicated, the tag-along venue provision in section 15.004 also applies. That provision states:

In a suit in which a plaintiff properly joins two or more claims or causes of action arising from the same transaction, occurrence, or series of transactions or occurrences, and one of the claims or causes of action is governed by the mandatory venue provisions of Subchapter B [including section 15.020], the suit shall be brought in the county required by the mandatory venue provision.[83]

Owens and Burke assert that, pursuant to section 15.004, the plaintiffs' claims against the nonsignatory defendants must be piggybacked onto claims that are subject to mandatory venue in Delaware because (1) the allegations in this case involve a major transaction within the meaning of section 15.020 and (2) the forum-selection clause in the 2010 Amended Shareholders Agreement provides for mandatory venue in Delaware as to the claims against the signatory defendants (the venture-capital shareholders and directors). The major transaction Owens and Burke cite is the 2010 Series B-1 Financing that precipitated the 2010 amendments to the shareholders agreement. That financing arrangement, they say, qualifies as a "major transaction" under section 15.020 because it involved "greater than $1 million" in consideration.

We do not agree that section 15.004 compels dismissal of the claims against Owens and Burke. First, section 15.020 requires the transaction to be "evidenced

by a written agreement under which a person pays or receives, or is obligated to pay or entitled to receive, consideration with an aggregate stated value equal to or greater than $1 million."[84] Although the written financing agreement was not included in the record, there does not appear to be any dispute that it does involve consideration above section 15.020's monetary threshold. But even if that circumstance is evident, or conceded, section 15.020(c)(2) applies only when "the party bringing the action has agreed in writing that an action *arising from the transaction* must be brought ... in another jurisdiction."[85] Here, the parties only agreed in writing that "any dispute arising out of" the *2010 Amended Shareholders Agreement* must be brought in Delaware. Importantly, the shareholders agreement is separate and distinct from the financing agreement. And even though disputes arising out of the shareholders agreement may concern other events connected with the transaction, the record bears no evidence that the parties ever agreed in writing on a particular forum for "an action arising from" the financing transaction. Accordingly, this argument fails.

Because Owens and Burke could not enforce the forum-selection clause against Sheldon and Konya under the legal theories presented, the trial court erred in granting their motion to dismiss.

### III. Conclusion

For the reasons stated, we therefore reverse the court of appeals' judgment, render judgment dismissing Sheldon's and Konya's claims in part, and remand the

82. *Id.* § 15.020(a).

83. *Id.* § 15.004.

84. *Id.* § 15.020(a).

85. *Id.* § 15.020(c) (emphasis added).